**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| NEXTGEN INNOVATIONS, LLC,<br>*Plaintiff*,<br>vs.<br>COREWEAVE, INC.,<br>*Defendant*. | CASE NO. 2:26-cv-00879<br><br>**Complaint for Patent Infringement**<br>**JURY DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement arising under the Patent Laws of the United States of America, 35 U.S.C. § 1 *et seq.*, in which Plaintiff NextGen Innovations, LLC ("Plaintiff" or "NextGen") makes the following allegations against Defendant CoreWeave, Inc. ("Defendant" or "CoreWeave"):

## INTRODUCTION

1. CoreWeave infringed the following United States patents directed to improvements to optical networking systems: United States Patent No. 9,887,795 (the "'795 Patent"), United States Patent No. 10,263,723 (the "'723 Patent"), and United States Patent No. 10,771,181 (the "'181 Patent") (collectively, the "Asserted Patents"). Plaintiff is the exclusive licensee of the Asserted Patents.

## PARTIES

2. NextGen is a Nevada limited liability company with its principal place of business at 5348 Vegas Dr. #396, Las Vegas, NV 89108. NextGen is the exclusive licensee of all right, title, and interest in the Asserted Patents.

3. On information and belief, Defendant CoreWeave, Inc. is a Delaware corporation with its principal place of business at 290 W. Mount Pleasant Avenue, Suite 4100, Livingston, New Jersey 07039.

4. On information and belief, CoreWeave has made, used, sold, offered for sale, and/or imported into the United States, including in this District, pluggable optical transceiver modules that practice the Asserted Patents, and has operated those modules to carry network traffic in its datacenters, including datacenter facilities located in this District.

## JURISDICTION AND VENUE

5. This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6. This Court has personal jurisdiction over CoreWeave in this action because CoreWeave has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over CoreWeave would not offend traditional notions of fair play and substantial justice. On information and belief, CoreWeave has committed acts of infringement in this District by using and operating the accused pluggable optical transceiver modules at its datacenter facilities in this District. Plaintiff's claims arise out of and relate to those activities.

7. Venue is proper in this District under 28 U.S.C. § 1400(b). CoreWeave has committed acts of infringement in this District and has a regular and established place of business in this District, as set forth below.

8. On information and belief, CoreWeave operates computing and networking infrastructure at the datacenter located at 1000 Coit Road, Plano, Collin County, Texas 75075, within this District. CoreWeave publicly announced its Plano datacenter in July 2023, and industry reporting identifies the facility at 1000 Coit Road as having become operational at the end of 2023. *See* https://www.prnewswire.com/news-releases/coreweave-opens-new-texas-data-center-to-expand-access-to-high-performance-gpus-301884897.html; https://dgtlinfra.com/coreweave-data-center-locations/.

9. City of Plano records identify CoreWeave, Inc. as the counterparty to an economic development incentive agreement concerning that facility. In December 2025, the City approved a Third Revised and Restated Economic Development Incentive Agreement under which the Company is required to "lease and Occupy at least 454,421 square feet of space" at 1000 Coit Road, "use the Real Property as a data center, and maintain Occupancy throughout the term of the Agreement." The approved agreement defines "Occupancy" to require that the Company be "regularly open and operating their business at the Property," and provides for a ten-year term beginning on the earlier of occupancy or December 31, 2023, unless sooner terminated. *See* https://plano.novusagenda.com/agendapublic/CoverSheet.aspx?ItemID=10476&MeetingID=3655; https://plano.novusagenda.com/agendapublic/AttachmentViewer.ashx?AttachmentID=20939&ItemID=10476.

10. CoreWeave also identifies Plano as a location for personnel who perform the work

of its datacenter business. For example, CoreWeave advertises a "Technical Deployment Lead - Central" position with Plano among its specified locations. CoreWeave describes the position as a "100% on-site role at one of our Central region, U.S. data centers," involving infrastructure delivery, training onsite teams, and hardware and network diagnostics. The listed duties include troubleshooting hardware and networks, performing on-site audits, and updating server and networking hardware. *See* https://www.coreweave.com/careers/job?4713173006&board=coreweave&gh_jid=4713173006.

11. On information and belief, CoreWeave exercises possession and control over the physical space at the Plano facility in which its equipment is installed; CoreWeave's equipment is installed there on a permanent and continuous basis; and CoreWeave's personnel regularly conduct CoreWeave's business there by installing, provisioning, configuring, monitoring, maintaining, servicing, and replacing its computing and networking equipment. On information and belief, CoreWeave maintains and operates the facility as a regular and established place of its own business.

12. CoreWeave's physical business presence in this District is further corroborated by the Texas Comptroller's registration for the Denton Data Center, which lists CoreWeave, Inc. as an operator under registration number LD394824-OP2. *See* https://comptroller.texas.gov/taxes/data-centers/data-center-lists.php. Core Scientific has also publicly announced a long-term agreement with CoreWeave for high-performance computing infrastructure at its Denton site. *See* https://investors.corescientific.com/news-events/press-releases/detail/110/core-scientific-and-coreweave-announce-1-2-billion-expansion-at-denton-tx-site.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Denton Data Center** | 09/19/2024 | | | Coreweave Compute Acquisition Co V LLC | LD394824-OC2 | • Core Scientific, Inc.<br>• Coreweave, Inc. | • LD394824-OP1<br>• LD394824-OP2 | |

13. On information and belief, CoreWeave used and operated the Accused Modules identified below at its Plano datacenter, including in the network equipment supporting its 100 Gbps network, to carry CoreWeave network traffic. By operating the Accused Modules, CoreWeave used the claimed apparatuses and performed the claimed method. On information and belief, the acts of infringement alleged herein were committed, in part, at the Plano facility that establishes venue in this District.

## FACTUAL BACKGROUND

14. Walter Soto and Alexander Soto are brothers, and the inventors of the claimed subject matter described in the Asserted Patents. Walter Soto has a bachelor's degree in Electrical Engineering, and has worked in the telecommunications industry since 1991. Alexander Soto has a master's degree in Electrical Engineering, and has worked in the telecommunications industry since 2000. The Sotos are the principals of Plaintiff, NextGen Innovations, LLC. As a result of their novel and useful inventions, the United States Patent and Trademark Office ("USPTO") has, to date, granted approximately forty-two patents to the Sotos, including all of the Asserted Patents.

15. For much of their careers, the Sotos worked for various engineering firms and defense contractors, including but not limited to Hughes Aircraft, Agere, Lucent, LSI, Broadcom, Cypress, Infineon, and AT&T, working on projects of various types in multiple subject matter areas such as signal processing, network protocol processing, wireline communications, wireless communications, optical communications and application specific integrated circuit chip design.

16. Early in 2003, with the U.S. silicon and telecommunication industry moving its projects and offices overseas, the Sotos decided to start their own company with the intention of innovating and producing high quality products in the U.S. The Sotos initially directed their work on passive optical network technologies because they expected that deployments of such

technologies would increase in the coming years, and that significant innovation in the space would be necessary and valuable. To this end, the Sotos worked to identify the most difficult and acute problems in the passive optical network-area. Because the Sotos recognized the value of their work, dedicating resources for patent protection for their innovations was a key business practice in their new company. This focus led to the filing of a number of patent applications, including provisional patent applications and utility patent applications.

17. In September 2003, the Sotos founded UBI Systems, Inc. to develop products and services for new enterprise services for passive optical LANs. The goal was to reduce the operational and capital expenses associated with enterprise-level fiber optic networks. For example, the Sotos sought to solve problems related to the elimination of Ethernet switches and copper-based Ethernet cables. Performance-wise, the Sotos believed they could develop and deploy solutions that would improve upon and replace existing enterprise solutions and, at worst, achieve performance parity with such systems while significantly reducing the electrical power consumed. The Sotos also believed that overall network security would be improved by their solutions, including, for example, eliminating security issues associated with traditional wiring closets by eliminating the need for such closets.

18. In approximately the first half of 2005, the Sotos began exploring other business models based on their expertise and innovations. In particular, the Sotos identified broadband access and related ecosystems as a space where their innovations would both add significant value and be attractive to potential investors. In May 2005, the Sotos founded iPON Systems, Inc. with the purpose of developing silicon and software products that reduced the operational and capital expenses associated with the deployment and maintenance of broadband access fiber optic networks.

19. One of the problems iPON sought to solve was how to scale passive optical network deployments. The Sotos believed that novel hardware and methods that allowed for the reuse of existing routers and switches would be beneficial. The Sotos sought to use small form-factor pluggable (SFP) modules that could effectively and efficiently convert a point-to-point SFP socket into a point-to-multipoint PON socket. Another problem iPON sought to solve was to eliminate the dependency on highly skilled technicians to deploy fiber optic networks. The Sotos believed that this problem could be addressed, at least in part, by reusing the wavelengths of a PON (passive optical network) to perform in-service optical time domain reflectometry (OTDR) tests, for example, that could be controlled by a network operation center (NOC) or remotely by technicians. Yet another problem the Sotos believed could be solved by iPON was eliminating problems related to powering a PON infrastructure. The Sotos believed that existing copper transmission lines (twisted wire-pair or Coax cables) could be used to provide not only broadband communications but also the power necessary for various optical network-specific equipment such as optical network terminals (ONTs) and optical network units (ONUs). Another problem identified by the Sotos was the need to eliminate wavelengths and the associated optical-to-electrical and electrical-to-optical conversion components being proposed for future networks at the time. The Sotos believed that m-ary technology could be used to solve this problem by increasing the number of bits per symbol in a given transmission.

20. To fund iPON's operations, the Sotos approached venture capitalists, self-funded, and sought partner companies to build an ecosystem of like-minded companies. For instance, the Sotos and iPON sought to build a network of partners that would build upon iPON's innovations to develop the necessary hardware and software components necessary to accomplish iPON's vision of lower cost and easy to deploy high performance fiber optic network product and services.

21. The efforts of the Sotos led to the development of an ecosystem of component suppliers, equipment vendors and end user service providers comprised of companies such as Finisar, Alcatel-Lucent, and AT&T.

22. For example, beginning approximately in April 2005, iPON began working with AT&T (through the AT&T Access Technology Labs team). AT&T performed an intensive review of iPON's proposed products and services solutions, including proposed capital expense and operation expense savings implicated by iPON's novel solutions. The AT&T Access Technology Labs team is responsible for technical requirements used for AT&T wireline and wireless broadband access networks deployments. Members of AT&T that iPON worked with included, but were not limited to, Raj Savoor (then general manager of AT&T Access Technology Lab), Steve Sposato (then Executive Director of AT&T Network Systems Engineering), Kent McCammon, Gene Edmon, Julie Lorentzen, and Estes Renee. AT&T recognized that iPON's proposed products and services solutions solved real problems, and iPON began to also work with a number of suppliers that could support deployments by AT&T, including but not limited to Alcatel-Lucent (now Nokia) and Finisar.

23. iPON approached Alcatel-Lucent's Internet Products Division (IPD) in approximately the July 2005 timeframe. iPON and Alcatel-Lucent extensively discussed iPON's technology and innovations, including its development of novel PON technology to be integrated into Alcatel-Lucent's 7x50 family of switches and routers. In approximately August 2007, the companies agreed to partner in the development and sale of iPON's technology (along with a third company, Finisar). The parties agreed to a lab trial based on iPON's GPON silicon within an XFP optical transceiver provided by Finisar that plugged into one of IPD's 7x50 products. The goal was to use this work, as well as iPON's work with potential customers (such as AT&T and Verizon),

to develop field trials as an early introduction of the novel GPON OLT functionality into Alcatel-Lucent's 7x50 family of switches and routers. Among others at Alcatel-Lucent, iPON worked with Basil Alwan (then-president of IPD), Ralph Ballart (then-IPD CTO), Sunil Khandekar (then-IPD switches product group lead), Kevin Macaluso (then-IPD service router product group lead), Ken Kutzler (then-IPD VP of Engineering), and Linda Garbanati. On information and belief, Nokia agreed to acquire Alcatel-Lucent in 2015 and Nokia closed the acquisition of Alcatel-Lucent in 2016.

24. Many venture capitalists were impressed with iPON's technology and the ecosystem the Sotos were building, particularly given the entrepreneurial, self-funded nature of the Sotos' efforts. Indeed, iPON and the Sotos had poured significant resources into developing their innovations, including patenting their inventions, exploring partnership opportunities with various network suppliers and providers, and getting fabrication work quotes from large manufacturing firms such as the Taiwanese firm TSMC.

25. Despite their efforts, the Sotos saw other companies, including former partners such as Finisar, Alcatel-Lucent and AT&T, bring their innovations to market. As a result, the Sotos formed NextGen in October of 2018 for the purpose of licensing the significant and valuable patent portfolio protecting the innovations that they had conceived.

26. NextGen has complied with the marking and other requirements of 35 U.S.C. § 287 for the Asserted Patents.

## THE ACCUSED INSTRUMENTALITIES

27. The instrumentalities accused of infringement in this action are pluggable optical transceiver modules that CoreWeave has made, used, offered for sale, sold, and/or imported into

the United States, and that perform m-ary modulation and demodulation, clock and data recovery, and equalization within the module (the "Accused Modules").

28. The Accused Modules include, without limitation, 100 Gbps single-lambda PAM4 transceivers in the QSFP28 pluggable form factor that convert four lanes of 25 Gb/s non-return-to-zero ("NRZ") electrical data into a single 100 Gb/s four-level pulse amplitude modulation ("PAM4") optical lane, and perform the reverse conversion on receive, exemplified by the NVIDIA MMS1V70-CM 100GbE QSFP28 DR1 transceiver identified in Exhibits 4–6.

29. CoreWeave has publicly described its use of NVIDIA networking in its cloud infrastructure. CoreWeave stated that its MLPerf results were achieved on "a production cluster built with NVIDIA Quantum-2 InfiniBand networking," and that the cluster included "over 40,000 cables and 500 miles of InfiniBand fiber cables." *See* https://www.coreweave.com/blog/mlperf-coreweave-nvidia-record-breaking-cloud-native-ai-supercomputer. CoreWeave's presentation at the 2023 Slurm User Group meeting also identified "100 Gbps Frontend Networking" as a feature of its HGX H100 supercomputer instances. *See* https://slurm.schedmd.com/SLUG23/CoreWeave-SLUG23.pdf.

30. NVIDIA describes the exemplary MMS1V70-CM as a hot-pluggable QSFP28 optical transceiver and states that it "converts 4 input channels of 25Gb/s NRZ electrical data to a single optical channel of 100Gb/s PAM4 optical signals over a single fiber, using a nominal wavelength of 1310nm, and vice versa for the receive path." NVIDIA also identifies transmit and receive clock-and-data-recovery controls, enabled by default for 100 GbE operation. *See* https://docs.nvidia.com/networking/display/mms1v70-cm-100gbe-qsfp28-dr1-transceiver-product-specifications.pdf, at 3–4, 8. The accompanying claim charts set forth the specific features and operations accused under each Asserted Patent.

**COUNT 1 – INFRINGEMENT OF THE ’795 PATENT**

31. Plaintiff incorporates by reference each of the allegations in the foregoing paragraphs above and further alleges as follows:

32. U.S. Patent No. 9,887,795 (the "’795 Patent"), entitled "System and Method for Performing High-Speed Communications over Fiber Optical Networks," was duly and legally issued by the United States Patent and Trademark Office on February 6, 2018. A true and correct copy of the ’795 Patent is attached hereto as Exhibit 1.

33. On November 29, 2018, the Sotos granted Plaintiff an exclusive license to the ’795 patent. Under the exclusive license, Plaintiff was granted all substantial rights in the ’795 patent until its expiration date including, without limitation, the exclusive right to sublicense, sue for infringement, and collect all past, present, and future damages.

34. The ’795 patent relates to, among other things, optical fiber communications generally, and more specifically to m-ary modulation in optical communication network. The claimed invention of the ’795 patent sought to solve problems with, and improve upon, optical networking systems. For example, the specification of the ’795 patent teaches the following:

> The performance of a fiber optic network can be measured by the maximum data throughput rate (or information carrying capacity) and the maximum distance between source and destination achievable (or reach). For Passive Optical Networks (PONs) in particular, additional measures of performance are the maximum number of Optical Networking Units (ONUs) and/or Optical Networking Terminals (ONTs) possible on a network and the minimum and maximum distance between the Optical Line Terminator (OLT) and an ONU/ONT. These performance metrics are constrained by, among other things, amplitude

> degradation and temporal distortions as a result of light traveling through an optical fiber.
>
> Amplitude degradation is substantially a function of length or distance between two end points of an optical fiber. Temporal distortion mechanisms include intramodal (chromatic) dispersion and intermodal (modal) dispersion. Intramodal dispersion is the dominant temporal dispersion on Single-mode fiber (SMF), while intermodal dispersion is dominant on Multi-mode fiber (MMF). Both types of temporal distortions are measured as functions of frequency or rate of transmission (also referred as line rate of a communication protocol) over distance in MHz·km. Temporal distortions are greater, hence a constraint on network performance, with increasing frequency transmission.

*See* '795 patent at 1:47-2:4. The specification also teaches the following:

> Implementations of the invention may include one or more of the following advantages.
>
> A system is proposed that provides for high-speed communications over fiber optic networks. The system may include the use of the one or more of the following techniques either individually or in combination: m-ary modulation; channel equalization; demultiplexing across multiple fibers, coding and error correction. M-ary modulation allows for increased data throughput for a given line rate due to an increase in the number of bits per symbol transmitted. Channel equalization reduces the effects of temporal distortions allowing for increased reach. Demultiplexing across multiple fibers allows lower lines rates for a given data throughput rate due to the increased aggregate data throughput from the multiplexing. Coding and error

> correction allows for a greater selection of qualifying optical components that can be used in the network and complements m-ary modulation and channel equalization for overall system performance improvement as measured by transmit energy per bit. These methods when combined (in part or in total) increase the data throughput and reach for fiber optic networks. For PONs in particular, these methods may increase the number of ONU/ONTs and the distance between OLT and ONU/ONT by decreasing the line rate as compared to a conventional communication system of equivalent data throughput.

*See* '795 patent at 6:1-26.

35. The inventions claimed in the '795 patent solve various technological problems inherent in the optical network systems including, by among other things, teaching how to (1) increase data throughput due to an increase in the number of bits per symbol transmitted, (2) reduce the effects of temporal distortions allowing for increased reach, (3) allow lower lines rates for a given data throughput rate due to the increased aggregate data throughput, (4) allow for a greater selection of qualifying optical components that can be used in the network, (5) complement m-ary modulation and channel equalization for overall system performance improvement as measured by transmit energy per bit, (6) increase the data throughput and reach for fiber optic networks, and (7) increase the number of ONU/ONTs and the distance between OLT and ONU/ONTs by decreasing the line rate as compared to other communication systems of equivalent data throughput.

36. The '795 patent is presumed valid under 35 U.S.C. § 282.

37. The written description of the '795 patent describes in technical detail each limitation of the claims, allowing a person of ordinary skill in the art to understand the scope of

the claims and to practice the claimed inventions, and confirms that the claimed combinations were not well-understood, routine, or conventional at the time of the invention.

38. CoreWeave infringed the ’795 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and/or importing into the United States the Accused Modules.

39. CoreWeave’s operation of the Accused Modules performs every step of at least Claim 1 of the ’795 Patent. A chart presenting a non-limiting example of CoreWeave’s infringement of Claim 1 of the ’795 Patent is attached hereto as Exhibit 4.

40. CoreWeave derives substantial revenue from the products and services that the Accused Modules support, including its GPU-accelerated cloud computing products and services. The Accused Modules carry the network traffic on which those products and services depend.

41. On information and belief, CoreWeave committed acts of infringement of the ’795 Patent at facilities within this District, including the Plano facility identified above.

42. Plaintiff has been damaged by CoreWeave’s infringement of the ’795 Patent and is entitled to recover damages adequate to compensate for that infringement, but in no event less than a reasonable royalty, together with interest and costs as fixed by the Court under 35 U.S.C. § 284.

## <u>COUNT 2 – INFRINGEMENT OF THE ’723 PATENT</u>

43. Plaintiff incorporates by reference each of the allegations in the foregoing paragraphs above and further alleges as follows:

44. U.S. Patent No. 10,263,723 (the “’723 Patent”), entitled “System and Method for Performing High-Speed Communications over Fiber Optical Networks,” was duly and legally issued by the United States Patent and Trademark Office on April 16, 2019. A true and correct copy of the ’723 Patent is attached hereto as Exhibit 2.

45. On November 29, 2018, the Sotos granted Plaintiff an exclusive license to the ’723 patent. Under the exclusive license, Plaintiff was granted all substantial rights in the ’723 patent until its expiration date including, without limitation, the exclusive right to sublicense, sue for infringement, and collect all past, present, and future damages.

46. The ’723 patent is a continuation of the ’795 patent and therefore contains the same teachings. Plaintiff therefore realleges and incorporates by reference the above paragraphs as if fully set forth herein.

47. The ’723 patent is presumed valid under 35 U.S.C. § 282.

48. The written description of the ’723 patent describes in technical detail each limitation of the claims, allowing a person of ordinary skill in the art to understand the scope of the claims and to practice the claimed inventions, and confirms that the claimed combinations were not well-understood, routine, or conventional at the time of the invention.

49. CoreWeave infringed the ’723 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and/or importing into the United States the Accused Modules.

50. The Accused Modules meet every limitation of at least Claim 1 of the ’723 Patent. A chart presenting a non-limiting example of CoreWeave’s infringement of Claim 1 of the ’723 Patent is attached hereto as Exhibit 5.

51. CoreWeave derives substantial revenue from the products and services that the Accused Modules support, including its GPU-accelerated cloud computing products and services. The Accused Modules carry the network traffic on which those products and services depend.

52. On information and belief, CoreWeave committed acts of infringement of the ’723 Patent at facilities within this District, including the Plano facility identified above.

53. Plaintiff has been damaged by CoreWeave's infringement of the '723 Patent and is entitled to recover damages adequate to compensate for that infringement, but in no event less than a reasonable royalty, together with interest and costs as fixed by the Court under 35 U.S.C. § 284.

## COUNT 3 – INFRINGEMENT OF THE '181 PATENT

54. Plaintiff incorporates by reference each of the allegations in the foregoing paragraphs above and further alleges as follows:

55. U.S. Patent No. 10,771,181 (the "'181 Patent"), entitled "System and Method for Performing High-Speed Communications over Fiber Optical Networks," was duly and legally issued by the United States Patent and Trademark Office on September 8, 2020. A true and correct copy of the '181 Patent is attached hereto as Exhibit 3.

56. On November 29, 2018, the Sotos granted Plaintiff an exclusive license to the '181 patent. Under the exclusive license, Plaintiff was granted all substantial rights in the '181 patent until its expiration date including, without limitation, the exclusive right to sublicense, sue for infringement, and collect all past, present, and future damages.

57. The '181 patent is a continuation of the '723 and '795 patents, and therefore contains the same teachings. Plaintiff therefore realleges and incorporates by reference the above paragraphs as if fully set forth herein.

58. The '181 patent is presumed valid under 35 U.S.C. § 282.

59. The written description of the '181 patent describes in technical detail each limitation of the claims, allowing a person of ordinary skill in the art to understand the scope of the claims and to practice the claimed inventions, and confirms that the claimed combinations were not well-understood, routine, or conventional at the time of the invention.

60. CoreWeave infringed the '181 Patent, literally and/or under the doctrine of

equivalents, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and/or importing into the United States the Accused Modules.

61. The Accused Modules meet every limitation of at least Claim 1 of the ’181 Patent. A chart presenting a non-limiting example of CoreWeave’s infringement of Claim 1 of the ’181 Patent is attached hereto as Exhibit 6.

62. CoreWeave derives substantial revenue from the products and services that the Accused Modules support, including its GPU-accelerated cloud computing products and services. The Accused Modules carry the network traffic on which those products and services depend.

63. On information and belief, CoreWeave committed acts of infringement of the ’181 Patent at facilities within this District, including the Plano facility identified above.

64. Plaintiff has been damaged by CoreWeave’s infringement of the ’181 Patent and is entitled to recover damages adequate to compensate for that infringement, but in no event less than a reasonable royalty, together with interest and costs as fixed by the Court under 35 U.S.C. § 284.

## **JURY DEMAND**

65. Plaintiff demands a jury trial on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and grant the following relief:

A. A judgment that CoreWeave has infringed one or more claims of each of the Asserted Patents in violation of 35 U.S.C. § 271;

B. An award of damages adequate to compensate Plaintiff for CoreWeave's infringement of the Asserted Patents, but in no event less than a reasonable royalty under 35 U.S.C. § 284, together with pre-judgment and post-judgment interest and costs;

C. An accounting for acts of infringement not presented at trial, and an award of damages for such acts;

D. A finding that this case is exceptional under 35 U.S.C. § 285, and an award of Plaintiff's reasonable attorney's fees and costs; and

E. Any and all other relief, at law or in equity, to which Plaintiff may be entitled.

Dated: October 2, 2026

Respectfully submitted,

*/s/ Benjamin T. Wang*

Benjamin T. Wang
CA State Bar No. 228712
Email: bwang@raklaw.com
Irene Y. Lee
CA State Bar No. 213625
Email: ilee@raklaw.com
Andrew D. Weiss
CA State Bar No. 232974
Email: aweiss@raklaw.com
Paul A. Kroeger
CA State Bar No. 229074
Email: pkroeger@raklaw.com
Qi (Peter) Tong
CA State Bar No. 300347
Email: ptong@raklaw.com
Sarah W. Wang
IL State Bar No. 6322872
Email: swang@raklaw.com
**RUSS AUGUST & KABAT**
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025
Telephone: 310-826-7474
Facsimile: 310-826-6991

**ATTORNEYS FOR PLAINTIFF,
NEXTGEN INNOVATIONS, LLC**